IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

TERESA F. ROGERS                                                                                       PLAINTIFF


V.                             Civil No. 2:17-cv-02119-PKH-MEF


NANCY A. BERRYHILL, Commissioner
Social Security Administration                                                                DEFENDANT


**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Teresa F. Rogers, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration denying her claim for supplemental security income ("SSI") benefits under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. § 1382. In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

**I.      Procedural Background**

Plaintiff filed her application for SSI on April 23, 2014, due to panic disorder, anxiety, depression, bipolar disorder, chronic insomnia, problems with both knees, memory problems, concentration problems, and learning problems. (ECF No. 8, pp. 197, 212, 287-292, 311, 336-337). On December 15, 2015, the Administrative Law Judge ("ALJ") held an administrative hearing. (ECF No. 8, p. 171-195). Plaintiff was present and represented by counsel.

As of her filing date, Plaintiff was 50 years old and possessed a general education equivalent. (ECF No. 8, pp. 38, 175, 312). Although she had worked as a cashier, factory

worker, and teller, none of Plaintiff's work qualified as past relevant work ("PRW") experience. (ECF No. 8, p. 38, 313, 329-335).

On April 22, 2016, the ALJ concluded that the Plaintiff's post-trauma stress disorder ("PTSD"), panic disorder, persistent depressive disorder, and borderline personality traits were severe, but concluded they did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (ECF No. 8, p. 31). He then found Plaintiff capable of performing a full range of work at all exertional levels with the following non-exertional limitations: the claimant is limited to simple, routine, and repetitive tasks involving only simple, work-related decisions with few if any workplace changes and no more than incidental contact with co-workers, supervisors, and the general public. (ECF No. 8, p. 34). With the assistance of a vocational expert, the ALJ found the Plaintiff capable of performing work as a packing machine operator, price marker, and plastics molding machine tender. (ECF No. 8, p. 39).

The Appeals Council denied the Plaintiff's request for review on May 12, 2017. (ECF No. 8, pp. 9-15). On July 11, 2017, after receiving additional medical evidence, the Appeals Council found no reason to reopen or change its May 2017 decision. (ECF No. 8, pp. 6-8). Subsequently, the Plaintiff filed this action. (ECF No. 1). This matter is before the undersigned for report and recommendation. Both parties have filed appeal briefs, and the case is now ready for decision. (ECF Nos. 12, 14).

## II. Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial

evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Teague v.* Astrue, 638 F.3d 611, 614 (8th Cir. 2011). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin,* 761 F.3d 853, 858 (8th Cir. 2014). If there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id.*

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D). A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical

3

and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience.  20 C.F.R. § 416.920(a)(4).  Only if he reaches the final stage does the fact finder consider the Plaintiff's age, education, and work experience in light of her residual functional capacity ("RFC").  *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982), *abrogated on other grounds by Higgins v. Apfel*, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. § 416.920(a)(4)(v).

### III.  Discussion

Plaintiff raises four issues on appeal: (1) Whether the ALJ's step two analysis is supported by substantial evidence; (2) Whether the ALJ properly developed the record; (3) Whether the ALJ conducted a proper credibility analysis; and, (4) Whether the ALJ's RFC determination is substantially supported.

### A. Step Two

Plaintiff contends that the ALJ erred at Step Two by failing to find any of her physical impairments severe.  At Step Two, a claimant has the burden of providing evidence of functional limitations in support of their contention of disability.  *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).  "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."  *Id.* (citing *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987); 20 C.F.R. § 404.1521(a)).  "If the impairment would have no more than a minimal effect on the claimant's

4

ability to work, then it does not satisfy the requirement of step two." *Id.* (citing *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007)).

In the present case, the ALJ found only Plaintiff's PTSD, panic disorder, persistent depressive disorder, and borderline personality traits to be severe. (ECF No. 8, p. 31). He concluded that her DDD, CTS, bilateral knee pain, and migraines were non-severe. Plaintiff now contends the ALJ failed to properly consider her physical impairments, both singularly and in combination. After reviewing the record, however, the undersigned disagrees.

Plaintiff has a history of migraine headaches dating back to at least 2005, neck pain, and lower back pain resulting from a lifting injury. (ECF No. 8, pp. 422-426, 512, 516, 521, 525, 530-531). Records reveal she was prescribed Topamax as a prophylactic, which mitigated but did not eradicate the headaches. (ECF No. 8, p. 521-523). In addition, Dr. Jason Ritchey prescribed Maxalt and Phenergan to treat acute headaches.

On July 14, 2013, during a confrontation with her son-in-law, Plaintiff was kicked in the right side of her head. (ECF No. 8, pp. 441-460). This resulted in a concussion with no loss of consciousness and cervical strain. A CT scan of Plaintiff's cervical spine revealed severe disk space narrowing, vacuum disk phenomenon (representing instability), and spondylitic ridging at the C5-6 level.

On August 24, 2014, Dr. Michael Westbrook conducted a general physical exam of the Plaintiff. (ECF No. 8, pp. 464-469). Despite Plaintiff's complaints of migraine headaches and bilateral knee problems, a physical exam revealed a normal range of motion in the shoulders, elbows, hands, hips, knees, ankles, cervical spine, and lumbar spine. Additionally, straight leg raise testing was negative; Plaintiff exhibited no muscle weakness, muscle atrophy, or sensory

5

abnormalities; and, x-rays of both knees were within normal limits. In fact, her gait and coordination were normal. Dr. Westbrook concluded Plaintiff would have minimal limitations in her ability to walk, stand, sit, lift, carry, handle, finger, see, hear, and speak.

On January 30, 2015, Plaintiff reported experiencing three to four migraine headaches per month. (ECF No. 8, 575-577). Although Dr. Kuykendall noted no abnormalities on exam, he referred her to Davis Neurology. Unfortunately, there are no records from Dr. Davis to indicate the Plaintiff followed through with the referral.

That same day, Dr. Kuykendall completed a headache questionnaire indicating that Plaintiff experienced more than one headache per week. (ECF No. 8, p. 483). Despite her good response to medication, he concluded that her headaches would result in more than one work absence per week.

In March, she reported continued problems with migraine headaches and requested medication refills. (ECF No. 8, pp. 569-571). Again, her physical exam was within normal limits. There is, however, no indication that the Plaintiff ever complained of specific headache symptomology so severe that it interfered with her ability to perform daily activities. The record merely reflects "headaches" or "migraine headaches."

On May 7, 2015, Dr. Kuykendall treated Plaintiff for back pain, mostly in the upper back, and bilateral knee pain. (ECF No. 8, p.p. 566-568). X-rays of her lumbar spine showed mild degenerative changes with no acute process, while x-rays of her knees were unremarkable. (EDF No. 8, pp. 553-556). Dr. Kuykendall diagnosed DJD of the lumbar/lumbosacral spondylosis without myelopathy and DJD of the left knee/osteoarthritis.

That same day, Dr. Kuykendall completed a medical source statement. (ECF No. 8, pp. 487-490). He concluded Plaintiff could lift/carry less than 10 pounds; stand and/or walk for a total of four hours per eight-hour workday; sit for a total of four hours; climb, balance, squat, kneel, crouch, bend, and stoop less than two hours each per workday; and, reach in all directions, handle, finger, grip, and feel six hours per day.

On July 8, 2015, Plaintiff was treated for back pain of two days duration. (ECF No. 8, pp. 563-565). Four days earlier, she reported having driven up to 14 hours per day while on vacation. (ECF No. 8, 494-498, 612-624, 628-640). Dr. Kuykendall prescribed Cyclobenzaprine.

On November 4, 2015, Dr. Kuykendall completed a second medical source statement. (ECF No. 585-587). He concluded Plaintiff could never lift and/or carry objects or push and/or pull due to DJD in the lumbar spine. Additionally, Dr. Kuykendall opined Plaintiff could climb, balance, squat, kneel, crouch, bend, and stoop less than two hours each per workday; and, reach in all directions, handle, finger, grip, and feel six hours per day.

On February 8, 2016, Dr. Kuykendall diagnosed cervicalgia. (EDF No. 8, pp. 76-77). Plaintiff reported numbness in her right arm for two weeks and pain in her right jaw and on the right side of her head. Despite the medications prescribed to treat her back and neck pain, she had received no relief from her pain. Dr. Kuykendall prescribed Cyclobenzaprine and Mobic. However, on March 1, 2016, Plaintiff reported complete resolution of her arm pain when she removed her ring. (ECF No. 8, pp. 73-75).

On August 15, 2016, Plaintiff complained of worsening right knee pain. (ECF No. 8, pp. 120-122). Fifteen days after the ALJ's decision, on September 6, 2016, Plaintiff was

7

referred to the Arkansas Orthopaedic Institute ("AOI"). (ECF No. 8, pp. 166-169). Plaintiff described the pain as moderate, rating it as a 7 on a 10-point scale. Further, she indicated that squatting, kneeling, sitting, bending, ascending/descending stairs, twisting, moving, lying in bed, running, and lifting exacerbated the pain. Tara Rogers, a physician's assistant at AOI, noted palpable patellar popping with passive and active knee extension, mild medial and lateral patellar facet tenderness, and mild medial and lateral joint line tenderness. Acknowledging Plaintiff's prior x-rays, she diagnosed chondromalacia of the right patella, ordered an MRI, and prescribed a hinged knee brace.

On September 14, 2016, Plaintiff reported significant improvement in her pain, rating the pain as a 6/10. (ECF No. 8, pp. 163-164). Dr. Russell Allison at AOI noted the MRI of her knee had shown no evidence of a meniscal tear, arthritis or other joint abnormalities. It showed only minimal a nonspecific posterior horn of the medial meniscus, signal abnormality, and small joint effusion. (ECF No. 8, p. 170). And, an exam revealed no crepitus, effusion, or tenderness on exam. Further, Plaintiff exhibited a full range of motion in all areas tested. Dr. Allison prescribed physical therapy ("PT").

PT records dated between September 23, 2016 and October 27, 2016 indicate Plaintiff's knee pain was responsive to therapy. (ECF No. 8, pp. 84-115). In fact, on October 20, she advised her therapist she could now wear wedge heels without pain. On October 31, 2016, Plaintiff was discharged after completing her therapy program. (ECF No. 8, 112-115). The therapist noted she had not been "hurting much at all" lately. Plaintiff was advised to keep the muscles firing for minimal joint pain, but also cautioned regarding over exertion. A gradual

increase of resistance over time was recommended, as was alternating heat and cold to treat any residual pain.

On December 1, 2016, Plaintiff reported headaches, but made no specific complaints. (ECF No. 8, pp. 117-119). A physical exam was unremarkable, and Dr. Kuykendall diagnosed migraine headaches and actinic keratosis.

While it is true that the Plaintiff was diagnosed with and intermittently treated for migraine headaches, lower back and neck pain, and right knee pain, a mere diagnosis is not sufficient to prove disability, absent some evidence to establish a functional loss resulting from that diagnosis. *See Trenary v. Bowen*, 898 F.2d 1361, 1364 (8th Cir. 1990). Here, repeated physical exams revealed no range of motion deficits and, at most, occasional tenderness in the affected area, and x-rays displayed minimal findings. Moreover, the Plaintiff did not seek out consistent treatment for her impairments and received only conservative treatment. *See Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003) (holding that ALJ may discount disability claimant's subjective complaints of pain based on the claimant's failure to pursue regular medical treatment); *see also Milam v. Colvin*, 794 F.3d 978, 985 (8th Cir. 2015) (holding conservative treatment is inconsistent with disability).

Additionally, it appears that the Plaintiff's migraine headaches were responsive to medication. *See Patrick v. Barnhart*, 323 F.3d 592, 596 (8th Cir. 2003) (if an impairment can be controlled by treatment or medication, it cannot be considered disabling). A CT scan of her head conducted in July 2009 revealed no acute abnormalities. (ECF No. 8, p. 543). There is also no evidence to suggest Plaintiff's headaches were as frequent or as severe as she alleged. Her complaints to her doctors did not include a detailed description of her symptoms or any

9

resulting limitations. In fact, her prophylactic and acute medication dosages did not require adjustments, suggesting that her symptoms were responsive to the dosages prescribed.

The Court also notes that the Plaintiff reported engaging in a variety of activities that undermine her physical complaints, including mowing the lawn, gardening, and driving 14 hours straight. (ECF No. 8, pp. 130-132, 612-624). Had her physical impairments been severe, particularly her knee and back issues, she would not have been able to perform these activities.

The record is also void of evidence to indicate that the Plaintiff complained of or was treated for CTS. Dr. Kuykendall indicated she could handle, finger, grip, and feel for 75 percent of an 8-hour workday. (ECF No. 8, p. 487-489, 585-587). Plaintiff was treated for some arm pain in February 2016, related to cervicalgia, but reported full resolution of the pain after removing her ring. (ECF No. 8, pp. 76-77, 79). Further, in August 2016, she was bitten on the arm by her daughter's cat. (ECF No. 8, pp. 120-122). However, there is no evidence that this resulted in any permanent limitations.

Accordingly, the Court finds substantial evidence to support the ALJ's determination that the Plaintiff's DJD (cervical and lumbar), CTS, bilateral knee pain, and migraines were non-severe.

### B. Development of the Record

The Plaintiff next asserts that the ALJ failed to properly develop the record in this case. The ALJ owes a duty to a claimant to develop the record fully and fairly to ensure his decision is an informed decision based on sufficient facts. *See Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004). The ALJ is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record. *Whitman v. Colvin*, 762 F.3d 701, 707 (8th Cir.

2014) (quoting *Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994). While "[a]n ALJ should recontact a treating or consulting physician if a critical issue is undeveloped," "the ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010) (quotation, alteration, and citation omitted).

The record in this case contains records from Plaintiff's treating physicians, Dr. Ritchey (dating back to 2005) and Dr. Kuykendall; x-rays of Plaintiff's knees and lumbar spine; an MRI of Plaintiff's cervical spine; a CT scan of Plaintiff's brain; the results of a general physical exam conducted by Dr. Westbrook; RFC assessments (mental and physical) completed by four non-examining consultants; emergency room records documenting her treatment for a head injury in 2013; the results of two mental diagnostic exams conducted by Dr. Walz; progress notes from Western Arkansas Counseling and Guidance Center ("WACGC") documenting Plaintiff's individual therapy and medication management; and, physical and mental RFC assessments prepared by Dr. Kuykendall. There is no indication that additional records exist that should have been subpoenaed. Further, there is no need for additional consultative exams.

Plaintiff contends that the ALJ's dismissal of Dr. Kuykendall's migraine statement because he could not discern who completed the form, triggered the ALJ's duty to develop the record. She does not, however, indicate what the ALJ was obligated to do. And, after reviewing the record, including the headache statement, the Court finds that the ALJ had no obligation in this regard. Accepting the statement as having been completed by Dr. Kuykendall, it appears the doctor based his opinion on Plaintiff's subjective reports concerning

11

the frequency and severity of her headaches.  The statement is inconsistent with the doctor's own treatment notes, which do not support his conclusion that Plaintiff would miss more than one day of work per week due to headaches.

Plaintiff also suggests that because Dr. Kuykendall's RFC assessments post-date the non-examining DDS opinion evidence, more recent DDS opinions are required.  Not so.  In September 2014, Dr. Jonathan Norcross reviewed the record and concluded Plaintiff's physical impairments were not severe.  (ECF No. 8, pp. 202-203).  On February 12, 2015, Dr. Sharon Keith came to the same conclusion.  (ECF No. 8, p. 218).  Unfortunately, Dr. Kuykendall's RFC assessments are both inconsistent with his treatment records and the overall record in this case.  The record does not support the existence of additional work restrictions not included in the RFC.  Accordingly, Dr. Kuykendall's opinions were not entitled to significant weight and would not have changed the DDS opinions.  As such, remanding this matter merely for a DDS consultant to review those assessments would be futile.

Therefore, the undersigned finds the record contains ample evidence upon which the ALJ could base his conclusion that Plaintiff is not disabled.

### C. Credibility Analysis

Plaintiff also insists that the ALJ erred in his credibility determination.  The ALJ is required to consider all the evidence relating to Plaintiff's subject complaints, including: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitation and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and, (5) function restrictions.  *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  In so doing, the ALJ must also consider the claimant's prior work record,

observations made by third parties, and the opinions of treating and examining physicians." *Polaski*, 739 F.2d at 1322.

An ALJ may not discount the Plaintiff's subjective complaints solely because the medical evidence fails to support them. *Id*. However, "[a]n ALJ . . . may disbelieve subjective reports because of inherent inconsistencies or other circumstances." *Wright v. Colvin*, 789 F.3d 847, 853 (8th Cir. 2015) (citing *Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007)) (quotation and citation omitted). The Eighth Circuit has observed, "[o]ur touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards*, 314 F.3d at 966.

Contrary to Plaintiff's assertion, the ALJ listed several valid reasons for discounting her subjective reports concerning the persistence and limiting effects of her symptoms. The ALJ found that Plaintiff had not received the type of medical treatment one would expect for a totally disabled individual; the treatment she did receive was essentially routine and/or conservative; and, her complaints were not consistent with the medical evidence of record. Plaintiff did not receive consistent treatment for any of her alleged disabling impairments during the relevant period. There is also no indication that her physical impairments were severe enough to warrant hospitalization or surgery. And, although Dr. Kuykendall did refer her to a neurologist for her headaches, Plaintiff failed to follow through with the referral. *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (claimant's noncompliance can constitute evidence that is inconsistent with a treating physician's medical opinion and, therefore, can be considered in determining whether to give that opinion controlling weight). Further, Plaintiff did undergo treatment for her right knee with orthopedist, Dr. Allison, but records indicate her knee pain resolved with PT.

13

The record does contain treatment notes from both counselors and psychiatrists at WACGC documenting Plaintiff's treatment for PTSD, depressive disorder, and anxiety. We note, however, that the Plaintiff did not seek out professional mental health treatment until one year after her alleged onset date and eight months post mental diagnostic evaluation with Dr. Walz. Progress notes from WACGC indicate she was prescribed both individual therapy and medication management. Although she did have a history of sexual and physical abuse as both a child and an adult, most of her complaints were related to her insomnia and situational issues such as her daughter forging Plaintiff's name on checks and the resulting court proceedings, her application for disability, and living with her mother. (ECF No. 8, pp. 666-669, 677-678). After some medication changes and adjustments, in May 2016, Plaintiff reported that her mood was "much better," and she was getting outside, mowing the grass, gardening, and doing other activities. (ECF No. 8, pp. 130-132). By July 2016, Plaintiff had moved in with her boyfriend. (ECF No. 8, pp. 124-127). And, in September, less than a month after the ALJ's decision, she reported socializing more. (ECF No. 8, pp. 133-134). *See Halverson v. Astrue*, 620 F.3d 922, 932 (8th Cir. 2010) (holding that visiting with family and friends is inconsistent with reports Plaintiff could not leave her home). At that time, her mood, energy, and motivation levels were "ok," and she complained of only "episodic" anxiety when she was around large groups of people.

The Court also takes note of the Plaintiff's adult function report, which indicates she can feed and water her pet; care for her personal hygiene with prompting; prepare simple meals daily; help with the laundry; sweep the floors; empty the trash; go outside daily; drive; go out alone; shop in stores once per week for "household stuff"; handle her finances; watch

14

television; follow written instructions; and, get along with authority figures. (ECF No. 8, pp. 338-345). *See id*. (holding acts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking are inconsistent with complaints of disabling pain).

Accordingly, the undersigned finds that the ALJ's credibility determination is supported by substantial evidence.

### D.  RFC Determination

In her final argument, the Plaintiff contends that the ALJ's RFC determination fails to account for all her impairments. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 416.945. A disability claimant has the burden of establishing his or her RFC. *Vossen,* 612 F. 3d at 1016. "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010); *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 416.945(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Miller v. Colvin*, 784 F.3d at 479 (citing *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012).

Plaintiff complains that Dr. Westbrook's physical assessment was conducted in August 2014, when the record only consisted of approximately 480 pages. The current record consists

15

of 707 pages; however, the entire medical record supports the ALJ's finding that Plaintiff's physical impairments were non-severe.

The Plaintiff also disputes the ALJ's reliance on the assessments prepared by the non-examining physicians because, they, too, were conducted in September 2014 and February 2015, prior to the entry of many of the Plaintiff's medical records. While these assessments do predate many of the medical records, the records dated after these assessments do not establish the existence of additional severe impairments. Further, they provide no basis for a reversal of the ALJ's RFC determination, as they do not suggest that additional restrictions are required. Plaintiff reported some off and on back and neck pain, but nothing consistent enough to warrant any limitations or restrictions from her treating physicians. Although her knee began to bother her toward the end of the relevant period, records indicate that it was responsive to physical therapy and resolved in two months.

The record does indicate that the Plaintiff suffered from migraine headaches, but again, she did not consistently seek out treatment for them. A CT scan of her head was within normal limits, and her headaches did not require emergency treatment. Further, although the Plaintiff made one report of experiencing three to four headaches per month, there are no additional reports concerning the frequency or severity of her headaches. And, based on the overall record, the Topamax and Maxalt prescribed to prevent and treat these headaches were successful. Accordingly, the Court concludes that Dr. Kuykendall's headache statement was based on Plaintiff's subjective complaints and is not supported by the record.

As for Dr. Kuykendall's physical RFC assessments, the ALJ concluded that they were inconsistent with both his own treatment notes and the overall medical evidence of record. The

16

undersigned agrees. As previously discussed, Dr. Kuykendall's physical exams documented few, if any physical findings. Unfortunately, his records do nothing more than provide diagnoses with no objective evidence of physical limitations. Aside from the medical sources he completed, Dr. Kuykendall's treatment notes provide no evidence that he ever placed any physical or mental restrictions on the Plaintiff's activities.

The ALJ was also correct in rejecting Counselor Glenda Evans' September 2015 and Dr. Kuykendall's November 2015 mental RFC assessments. The ALJ correctly noted counselors are not acceptable medical sources who can be relied upon to establish the existence of a disabling impairment. 20 C.F.R. § 416.913(a). Their opinions, however, when supported by the record, can be used to establish the severity of a medically determination impairment. 20 C.F.R. § 416.927(a)(2); SSR 06-3p. Ms. Evans found Plaintiff had no useful ability to understand, remember, and carry out very short and simple instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance; be punctual within customary tolerances; sustain an ordinary routine without supervision; respond appropriately to supervision, co-workers, and usual work settings; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in work setting; set realistic goals or make plans independently of others; function independently; behave in an emotionally stable manner; relate predictably in

17

social situations; demonstrate reliability; work without deterioration or decompensation causing the individual to withdraw from the situation; and, work without deterioration or decompensation causing exacerbation of symptoms or adaptive behaviors. (ECF No. 8, pp. 580). Two months later, Dr. Kuykendall found the Plaintiff to have no useful ability to sustain an ordinary routine without supervision; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; and, demonstrate reliability. (ECF No. 8, p. 584). Ms. Evan's assessment was completed four months after the Plaintiff began treatment at WACGC, while Dr. Kuykendall's check-box form was completed only six months after she began therapy. Several months and medication changes later, the Plaintiff reported a much improved mood. (ECF No. 8, pp. 130-132). In July 2016, she moved in with her boyfriend, and two months later, she was socializing more and reporting only episodic anxiety when in large groups. (ECF No. 8, pp. 124-127, 133-134). Accordingly, while the Plaintiff may have initially been socially withdrawn and avoidant, her symptoms were clearly responsive to medication and therapy. Thus, the mental assessments of Ms. Evans and Dr. Kuykendall were of little value in this case, as they predate and do not account for the Plaintiff's response to treatment.

For many of the same reasons, the consultative exams and assessments of Dr. Patricia Walz were also unsupported by the overall record. In September 2014, Dr. Walz diagnosed the Plaintiff with panic disorder, agoraphobia, and personality disorder with borderline and dependent traits. (ECF No. 8, pp. 471-476). She assessed her with fair social skills due to her isolation and anxiety; impaired attention and concentration; low frustration tolerance; and,

18

slow information processing. In January 2016, Dr. Walz examined Plaintiff for a second time, diagnosing PTSD, borderline personality traits, panic disorder, persistent depressive disorder, anxiolytic use disorder in remission, and cannabis use disorder in remission. (ECF No. 8, pp 589-593). She assessed marked limitations in her ability to interact appropriately with the public and respond appropriately to usual work situations and to changes in a routine work setting. (ECF No. 8, pp. 594-596). Dr. Walz also found moderate limitations in Plaintiff's ability to interact appropriately with co-workers. Based on Dr. Walz's notes, the Plaintiff told her that she "never goes anywhere or does anything." According to WACGC records, four months later, her mood significantly improved, and within eight months, she reported socializing more. Thus, while Dr. Walz's assessment may have been valid at the time it was completed, the record shows that the Plaintiff's mental impairments improved thereafter. This renders Dr. Walz's opinion of little value to the ALJ's RFC determination in this case. And, the ALJ correctly assigned her assessment only "some weight." (ECF No. 8, p. 36).

For these reasons, the undersigned finds substantial evidence to support the ALJ's determination that the Plaintiff can perform a full range of work at all exertional levels with the following non-exertional limitations: the claimant is limited to simple, routine, and repetitive tasks involving only simple, work-related decisions with few if any workplace changes and no more than incidental contact with co-workers, supervisors, and the public.

### IV. Conclusion

Based on the foregoing, it is recommended that the ALJ's decision be affirmed and the Plaintiff's Complaint be dismissed with prejudice.

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 6th day of July 2018.

/s/ Mark E. Ford
HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE